**TRANS STATES AIRLINES, formerly Resort Air, Inc., d/b/a Trans World Express, Plaintiff–Appellee,**

v.

**PRATT & WHITNEY CANADA, INCORPORATED, a subsidiary of United Technologies Corporation, a corporation, Defendant–Appellant.**

No. 95–2896.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1996.

Decided June 19, 1996.

Hugh G. McBreen (argued), Annie K. Strobl, McBreen, McBreen & Kopko, Chicago, IL, for Plaintiff-Appellee.

Michael A. Pope (argued), Daniel J. Collins, Phelan, Cahill & Quinlan, Chicago, IL, James D. Dasso, Foley & Lardner, Chicago, IL, for Defendant-Appellant.

Before COFFEY, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Whenever we are called upon to decide an issue for which state law provides the rule of decision, the Rules of Decision Act, 28 U.S.C. § 1652, and the doctrine of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), require us to ascertain what state law requires as accurately as we possibly can. Parties should not have an incentive to switch from a state courtroom to a federal courtroom in the hopes of altering the substantive law that applies to their cases. As a federal court, however, we operate under one critical limitation that does not exist for the state judiciary: when the state law is unsettled, or there is a possibility that it may change or evolve, only the state court has the authority to resolve the matter definitively.

Notwithstanding this advantage of litigating in state court, parties continue to exercise their undoubted right to file lawsuits in federal court under the diversity jurisdiction, 28 U.S.C. § 1332, and unsettled questions of state law continue to arise. In the normal case, the federal courts consult decisions of the state supreme court, state appellate courts, and any other source of guidance, and they do the best they can. When the question is truly unsettled, however, and when its resolution will be determinative of the outcome, a federal court may have the option of certifying the issue to the state supreme court, which in turn may choose to take the case and provide the authoritative answer.

We have concluded that the case before us is an ideal candidate for certification to the Illinois Supreme Court, pursuant to the procedure set forth in Rule 20 of that Court's rules. We explain in this opinion why we believe that there are "questions as to the law of [Illinois], which may be determinative of the ... cause," and why there appear to be "no controlling precedents in the decisions" of the Illinois Supreme Court. We hereby respectfully request the Supreme Court of Illinois to answer the following questions:

1. For purposes of the economic loss doctrine, as developed by the Illinois Supreme Court in *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), *Vaughn v. General Motors Corp.,* 102 Ill.2d 431, 80 Ill.Dec. 743, 466 N.E.2d 195 (Ill.1984), *Board of Education v. A, C and S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989), and *In re Illinois Bell Switching Station Litigation,* 161 Ill.2d 233,

204 Ill.Dec. 216, 641 N.E.2d 440 (1994), does Illinois recognize a "sudden and calamitous occurrence" exception to the doctrine under which recovery in tort is possible for injury to the single product?

2. Can a product and one of its component parts ever constitute two separate products, and if so, did the airframe and the engine that failed in this case constitute a single product or two distinct products?

For the reasons set forth below, we believe that the answers to these questions will definitively resolve the dispute now before us.

## FACTUAL BACKGROUND

On July 17, 1991, Trans States Airlines Flight 7128 left St. Louis, Missouri, for Peoria, Illinois, as scheduled. The left engine on the ATR 42–300 airplane had operated safely for nearly two years and more than 5,500 flight hours. On the plane's final approach to the Peoria airport, the left engine failed catastrophically, catching fire and shutting down. After regaining control of the plane, the pilot was able to land safely. The crew quickly evacuated the passengers and, working with airport firefighters, extinguished the fire without further incident. The post-incident investigation revealed that the engine failed after some of its interturbine duct (ITD) bolts loosened and fractured in flight. Bolt fragments hit the engine's power turbine blades, damaging the blades and causing an imbalance overload of the power turbine rotor. The resulting fire damaged both the engine and the body of the aircraft.

Discovery revealed that Pratt & Whitney had been concerned for some time prior to the accident about the ability of the ITD bolts to withstand the high temperatures to which they were exposed during flight. Pratt & Whitney engineers raised this concern in various memoranda, prompting the company to conduct a number of tests. Following the tests, the engineers recommended certain modifications, and Pratt & Whitney began monitoring ITD bolt failures in the field. Pratt & Whitney did not, however, alter the engine or the maintenance procedure before July 17, 1991.

Pratt & Whitney manufactured the allegedly defective engine in 1988. It sold the engine to Societe Nationale Industrielle Aerospatiale, Usine de Toulouse, Service de Comptabilte (Aerospatiale), a large French aircraft manufacturer, under a written sales contract that included an express warranty clause. Aerospatiale incorporated the engine into one of its ATR 42–300 airplanes, which it sold to McDonnell Douglas Finance Corporation (MDFC), passing Pratt & Whitney's warranty through to MDFC. MDFC then leased the plane to a company called GPA ATR Inc. (GPA), which in turn subleased the plane to Trans States, the plaintiff below and appellee here.

Although the engine had passed through a number of hands between Pratt & Whitney and Trans States, the engine warranty ran directly to Trans States. It appeared as section 4(a) of the Sales Contract between Pratt & Whitney and Aerospatiale and provided for repair or replacement of the engine for a defect discovered during the first 90 days or 150 flight hours of operation, whichever occurred first. Subsection 4(d) of the Sales Contract made this express warranty the "Buyer's" exclusive remedy, in lieu of any implied warranties and "any obligation, liability, right, claim, or remedy in contract or tort, whether or not arising from Seller's negligence, actual or imputed." A subsequent warranty and service agreement modified the express warranty, extending it to 1,000 flight hours, 1,000 flights, or six months, whichever occurred last.

Trans States contacted Pratt & Whitney directly for matters relating to the maintenance and condition of the engine. In response to certain engine condition monitoring data that Trans States had sent to it, Pratt & Whitney on July 9, 1991, faxed Trans States a letter recommending a visual inspection of the engine with a boroscope and other "appropriate action." Trans States followed through on the suggestion, but found nothing noteworthy. It asserts that the specified procedures neither did nor could identify the problem with the ITD bolts.

In many ways, the parties treated the engine and the aircraft as two distinct products.

Under the GPA lease, Trans States was required to maintain and repair the aircraft and to return the airframe with two engines at the end of the lease term. The engines, however, did not need to be the original engines installed on the airframe. To the contrary, Trans States was entitled to return the ATR 42–300 with any two engines certified for use on that model. Trans States indicated (and Pratt & Whitney did not disagree) that engines are often removed from airframes and interchanged with engines on different airframes as part of a scheduled maintenance program. In addition, the engine was registered with the Federal Aviation Administration separate and apart from the airframe registration. Each engine had its own title documentation, again separate from the airframe title records. The engine was sold with its own operating and maintenance manuals, prepared by Pratt & Whitney, and as Pratt & Whitney itself emphasized, the engine had its own warranty. This warranty was separate from the warranty that applied to the airframe.

## PROCEDURAL POSTURE OF THE CASE

Trans States filed a three-count amended complaint against Pratt & Whitney in the district court for the Northern District of Illinois on March 6, 1992. The complaint alleged claims based on (1) negligence, (2) breach of warranty, and (3) strict liability, all arising out of the deterioration and corrosion of the ITD bolts in the PW120 engine, which resulted in the in-flight incident described above. Trans States sought to recover the $278,617.16 it spent repairing the engine, the $1,279,254.58 it spent repairing the airframe, the $194,923.55 it lost in revenues from canceled flights, and the $22,500 it paid to settle passengers' personal injury claims. Pratt & Whitney moved for summary judgment on claims (1) and (3), the two tort claims, on the ground that the Illinois economic loss doctrine barred recovery.

On October 20, 1993, Judge Charles B. Kocoras, to whom this case was originally assigned, ruled on Pratt & Whitney's motion. *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 836 F.Supp. 541 (N.D.Ill.1993).

Following his earlier ruling that Illinois law applied to the case, he addressed the question whether Illinois law permitted Trans States to recover under its negligence and strict liability theories. Relying principally on the United States Supreme Court's decision in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), rather than any decision of the Illinois Supreme Court, he concluded that damage to the airframe was damage to "other property" and therefore was compensable in tort under Illinois law. Damage to the engine itself from the defective bolt, he concluded, was not damage to "other property," and hence Trans States had no tort claim for it. Finally, Judge Kocoras considered which of the particular items of damages were cognizable in the tort action. He ruled that damages for the cost of repairing the airframe and for the personal injuries were recoverable in tort (subject, of course, to proof of causation, liability, and amount of damages) but that the damages for repairing the engine itself and for the lost revenues were not. On that basis, he denied Pratt & Whitney's motion for summary judgment on all grounds except as to the two grounds of damages that he had found were unavailable in tort.

By order of the Executive Committee of the Northern District of Illinois, the case was reassigned to Judge Ruben Castillo of that court effective May 25, 1994. Trans States then filed a Motion to Reconsider the court's prior ruling on the recoverability of lost revenue and engine repair costs, which the court construed as falling under Federal Rule of Civil Procedure 60(b). (Although it makes no difference for purposes of certification, we note that Rule 60(b) was not the correct vehicle. Rule 60(b) applies only for requests for relief from final judgments, whereas Judge Castillo was simply considering whether to alter the law of the case.) In an opinion dated February 8, 1995, Judge Castillo granted that motion and, in spite of his reluctance to overturn another judge's prior decision, concluded that plaintiffs in Illinois may recover purely economic losses (including the lost revenue and engine repair costs that Judge Kocoras had denied) if they prove two things: (1) that the product failed sud-

denly and calamitously, and (2) that the failure caused at least some non-economic losses. *Trans States Airlines,* 875 F.Supp. 522 (N.D.Ill.1995). In reaching this conclusion, he relied principally on *Moorman, East River, and American Xyrofin, Inc. v. Allis–Chalmers Corp.,* 230 Ill.App.3d 662, 172 Ill. Dec. 289, 595 N.E.2d 650 (2d Dist.1992).

Judge Castillo then set the case for trial on May 8, 1995. The parties, however, asked him to certify for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) the question whether Pratt & Whitney's gas turbine engine and the Aerospatiale airframe were an integrated unit of the Trans States airplane, under the economic loss doctrine set forth in the Supreme Court's decision in *East River.* In an order that also discussed *Moorman* and *Illinois Bell,* he certified the issue to this Court for interlocutory review.

The standard for an interlocutory appeal under 28 U.S.C. § 1292(b) is similar to, though not identical with, the standard expressed in Illinois Supreme Court Rule 20. An interlocutory appeal is available under § 1292(b) if the district court order involves a "controlling question of law as to which there is substantial ground for difference of opinion," and if "an immediate appeal from the order may materially advance the ultimate termination of the litigation." It is not enough for the district court to certify that the order meets these standards; the Court of Appeals makes its own independent determination as well. Only when both courts agree does the interlocutory appeal go forward. In this case, this Court agreed to accept the appeal on July 17, 1995.

## RULE 20 REQUIREMENTS

With respect to the negligence and product liability claims, we have concluded that the scope of the Illinois economic loss doctrine is determinative. If, as Pratt & Whitney argues, recovery in tort is not available when injury occurs to a component part of a single product, no matter how sudden or calamitous the event leading up to the injury, and the engine and airframe are properly characterized as a single product, then Trans States must lose as a matter of law on its two tort claims. The case would therefore be over on

those two claims. If, on the other hand, Illinois either recognizes an exception to the single product rule for sudden and calamitous injury, or Illinois law would characterize the engine and the airframe as two separate products, then tort recovery is possible and further proceedings would be necessary.

The fact that this is an interlocutory appeal does mean that a ruling from the Illinois Supreme Court here would not terminate the remaining contractual claims in the litigation, which are not before us either. We note, however, that the Illinois Supreme Court uses a similar certification procedure for appeals from the Appellate Court when a case "involves a question of such importance that it should be decided by the Supreme Court." Illinois Supreme Court Rule 316. While this is plainly a question for the Illinois Supreme Court to evaluate as it sees fit, we add a few words here to explain why we chose to grant interlocutory review, and why we are now seeking an authoritative ruling from the Illinois Supreme Court.

This case involves, at the most fundamental level, the boundary line between contract claims and tort claims. The economic loss doctrine, where "economic loss" refers to the costs of repairing or replacing a defective product and consequent loss of use of the product, is one mechanism for allocating risk between the manufacturer of a product and the owner of a product. As the Supreme Court noted in *East River,* 476 U.S. at 868, 106 S.Ct., at 2301, courts have marked this boundary in many different places. The two principal competing camps laid down their respective positions more than thirty years ago. In *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1945), the California Supreme Court held that contract law provides the exclusive remedy when a product causes only monetary harm. Taking the opposite view, in *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), the New Jersey Supreme Court held that a manufacturer's duty to build defect-free products can be enforced whether or not the product injures, or threatens to injure, anything other than itself. Between these two positions, various intermediate positions have since appeared, and occasionally, disap-

peared. See *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir.1981) (advocating a "calamitous occurrence" approach) (Pennsylvania law), rejected by *Aloe Coal v. Clark Equipment Co.*, 816 F.2d 110, 118 (3d Cir.1987) (adopting a collateral damage approach) (also Pennsylvania law); *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 329 (Alaska 1981) (looking to the potential danger of the defective product); *Russell v. Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383, 1387 (1978) (allowing "endangered" product users to recover in tort). See also *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1181 (Alaska 1993) (reaffirming the "potential danger" approach); *National Union Fire Ins. Co. v. Pratt and Whitney Canada, Inc.*, 107 Nev. 535, 815 P.2d 601, 604–605 (1991) (rejecting "calamitous occurrence" approach in favor of collateral damage approach).

Our review of the controlling Illinois law leaves us unable to predict with confidence which approach the Illinois Supreme Court would take on this important doctrine. As the court explained in *Moorman, supra,* 61 Ill.Dec. at 746, 435 N.E.2d at 443, tort law exists to protect public safety, while contract law serves to define and protect "expectation interests." Noting the treacherous intersection of these ideals at strict product liability, the court explained that, while tort law allows recovery for the damages caused by hazardous products, contract law provides the exclusive remedy for loss of expectation interests. Relying on *Pennsylvania Glass,* the court drew the line between recovery in contract and recovery in tort by distinguishing losses caused by "deterioration, internal breakdown or nonaccidental cause" from those arising from a "sudden and dangerous occurrence." *Id.* 61 Ill.Dec. at 753, 435 N.E.2d at 450. Tort would provide relief for the latter and contract the former.

In *East River,* the Supreme Court rejected this approach to separating tort from contract in strict product liability for purposes of federal admiralty law. It explained:

> The intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers

easily to structure their business behavior. *Nor do we find persuasive a distinction that rests on the manner in which the product is injured.* We realize that damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

*Id.* at 870, 106 S.Ct. at 2301–02 (emphasis added and citations omitted). In place of these approaches, the Court held that strict product liability would not attach when the product injured only itself.

Following *East River,* the Illinois Supreme Court revisited the economic loss doctrine briefly in *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986), and then at greater length in *A, C and S, Inc.*, 137 Ill.Dec. at 635, 546 N.E.2d at 580. In *A, C and S,* thirty-four school districts sued a host of asbestos manufacturers, asbestos installers and construction companies for the cost of removing asbestos from buildings around the state. The plaintiffs included among their various theories of recovery a strict product liability claim. The defendants insisted that the plaintiffs were seeking to recover purely economic losses and argued that *Moorman* blocked the claim. In a reexamination of the economic loss doctrine, the court explained that, in Illinois, tort recovery for physical harm should be distinguished from contract recovery for economic losses by "the nature of the defect and ... the manner in which the damage occurred." *Id.* 137 Ill.Dec. at 641, 546 N.E.2d at 586. At the same time, the court appeared to endorse the Supreme Court's approach in *East River,* explaining that it had "previously rejected [*Pennsylvania Glass*'s] intermediate position." *Id.* 137 Ill.Dec. at 643, 546 N.E.2d at 588. Ultimately, the court concluded that

the doctrine did not apply because the asbestos products and the buildings of which they were a part were not a single unit.

The Illinois Supreme Court most recently discussed economic loss in *Illinois Bell, supra,* 204 Ill.Dec. at 216, 641 N.E.2d at 440. *Illinois Bell* grew out of the mass of litigation surrounding the May 8, 1988, fire at Bell's Hinsdale switching station. The fire destroyed Bell's switching equipment and left Bell's customers without phone service for more than a month. Many of these customers sued Bell to recover the damages they suffered as a result of the extensive service interruption. Bell argued that these losses were purely economic and unrecoverable in tort. The court agreed. Without mentioning *East River* or *A, C and S,* the *Illinois Bell* opinion identified three exceptions to the general rule precluding recovery of economic losses in tort:

> (1) where the plaintiff has sustained damage resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are the proximate result of a defendant's intentional, false representation; and (3) where the plaintiff's damages are a proximate result of a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.

*Id.* 204 Ill.Dec. at 219–20, 641 N.E.2d at 443–44 (citations omitted). It found that none of these exceptions applied. The court went on to hold that a section of the Universal Telephone Service Protection Law of 1985, which allowed customers affected by the failure of a utility to abide by state laws or regulations to recover "all loss, damages or injury caused thereby or resulting therefrom," could not be read to extend recovery beyond that provided by tort.

In our view, these cases point in different directions. On the one hand, in *A, C and S,* the Illinois Supreme Court embraced the *East River* approach to the economic loss doctrine. On the other hand, in both *A, C and S* and *Illinois Bell,* the Illinois Supreme Court reiterated that purely economic losses are recoverable if lost as a result of "a sudden or dangerous occurrence." These competing approaches, as the

Supreme Court explained in *East River,* are irreconcilable. The *East River* approach focuses on the product and whether it damaged anything other than itself. The *Pennsylvania Glass* approach inspects the product failure and the risks associated with that failure. The positions draw support from the competing concerns of contract law and tort law. On the one hand, given that economic losses are generally borne by the owner of the product, rather than by its user or some other stranger to the original purchase, one can argue that the law should allow the manufacturer and the owner to sort out liability through contract. If a prospective owner of the product wants to ensure that the manufacturer will repair or replace a defective product, she can bargain for a more comprehensive warranty (and pay a higher price). On the other hand, one might assert that where the product fails in a "sudden or calamitous" manner, the public safety concerns embodied in tort should be invoked.

In addition, if the *East River* approach is adopted (though we do not express a preference here), there is nothing obvious about how to draw the line around a single "product." *East River* is a good case in point: the product might have been the components of the turbine; it might have been the turbine as a whole; or it might have been the entire ship. The Supreme Court settled on the turbine. On the other hand, in *A, C and S,* the Illinois Supreme Court distinguished the asbestos insulation from the buildings in which it had been installed. The extent to which commercial usage, customer expectation and government regulation inform or control this effort to separate one product from another will determine the scope of the economic loss doctrine itself. The ultimate answer to both questions should be informed by the tort law and contract law of Illinois—subjects about which, in this context, only the Illinois Supreme Court can speak authoritatively.

We conclude with a word about the warranty claim that was not part of the appeal before this Court, and thus which is not involved in this certification request. As a practical matter, given the language of the warranties set forth earlier in this opinion, it

is unclear how much of the case will be left if the tort claims drop out. We make no ruling here on the warranty issues, of course, but the vigor with which both parties have addressed the tort claims shows plainly enough what they think the case turns on. The warranty claim is, in any event, an independent legal claim, whose resolution would not affect the questions that are being certified. We therefore respectfully suggest that the continued pendency of the warranty claims neither diminishes the importance of the questions we have posed about the Illinois economic loss doctrine nor renders them merely hypothetical.

The Clerk of this Court will transmit the briefs and appendices in this case to the Illinois Supreme Court, together with this opinion. Upon the request of the Illinois Supreme Court, the Clerk will transmit all or any part of the record as that Court so desires.