(No. 81291.—

# TRANS STATES AIRLINES, Appellee, v. PRATT & WHITNEY CANADA, INC., Appellant.

*Opinion filed June 19, 1997.*

HEIPLE, J., concurring in part and dissenting in part.

HARRISON, J., joined by McMORROW, J., concurring in part and dissenting in part.

McDermott, Will & Emery, of Chicago (Michael A. Pope and Mark K. Anderson, of counsel), for appellant.

Hugh G. McBreen and Annie K. Strobl, of McBreen, McBreen & Kopko, of Chicago, for appellee.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

This cause is before us on questions of Illinois law certified by the United States Court of Appeals for the Seventh Circuit. 145 Ill. 2d R. 20. The certified questions are as follows: (1) "For purposes of the economic loss doctrine, as developed by the Illinois Supreme Court in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982) [and its progeny], does Illinois recognize a 'sudden and calamitous occurrence' exception to the doctrine under which recovery in tort is possible for injury to the single product?" (2) "Can a product and one of its component parts ever constitute two separate products[?]" and (3) "[D]id the airframe and the engine that failed in this case constitute a single product or two distinct products?"

For the reasons which follow, we answer question number one in the negative and question number two in the affirmative. Concerning question number three, we conclude that the engine and airframe in this case constitute a single product.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Trans States Airlines, is a common carrier providing scheduled air service to the public. Defendant,

Pratt & Whitney Canada, is a manufacturer of gas turbine engines for use on commercial aircraft.

In 1988 defendant manufactured the Pratt & Whitney PW120 engine bearing the serial number 120656. Defendant sold the engine new to Societe Nationale Industrielle Aerospatiale, Usine de Toulouse, Service de Comptabilte (Aerospatiale), a large French aircraft manufacturer, under a written sales contract that included an express warranty clause. The engine was sold with its own operating and maintenance manuals prepared by defendant. Aerospatiale incorporated the engine into one of its ATR 42-300 airplanes, N425TE, which it then sold to McDonnell Douglas Finance Corporation (MDFC), passing defendant's warranty through to MDFC. MDFC then leased the plane to a company called GPA ATR Inc. (GPA), which in turn subleased the plane to plaintiff in this cause. The engine was warranted separate and apart from the Aerospatiale airframe warranty.

Although the engine had passed through a number of hands between plaintiff and defendant, the engine warranty ran directly to plaintiff. It appeared as section 4(a) of the sales contract between defendant and Aerospatiale and provided for repair or replacement of the engine for a defect discovered within the first 90 days or 150 flight hours of operation, whichever occurred first.

Section 4(d) of the sales contract made this express warranty the "Buyer's" exclusive remedy, in lieu of any implied warranties and "any obligation, liability, right, claim, or remedy in contract or tort, whether or not arising from Seller's negligence, actual or imputed." A subsequent warranty and service agreement modified the express warranty, extending it to 1,000 flight hours, 1,000 flights, or six months, whichever occurred last.

The sublease agreement was solely between plaintiff and GPA. Pursuant to its terms, at the end of the lease

term, plaintiff was obligated to return the aircraft with two engines. The agreement further provided that, upon return of the aircraft, the engines need not be the original engines which had been installed on the airframe. As per the agreement, a Pratt & Whitney PW120 engine certified for use on an ATR 42-300 was interchangeable with any other Pratt & Whitney PW120 engine.

On July 17, 1991, aircraft ATR 42-300, N425TE, being operated by plaintiff as flight 7128, experienced an overload failure of the left engine, serial number 120656, and an in-flight fire while on approach to landing at Greater Peoria Airport in Peoria, Illinois. After the pilot executed an emergency landing, the passengers were evacuated onto the runway, and the fire was extinguished by attending ground crew. Two of the passengers suffered minor personal injury.

The post-accident investigation revealed that the engine failed after some of its interturbine duct bolts loosened and fractured in flight. Bolt fragments hit the engine's power turbine blades, damaging the blades and causing an imbalance overload of the power turbine rotor. The resulting fire damaged both the engine and the body of the aircraft.

On March 6, 1992, plaintiff filed a three-count amended complaint against defendant in the District Court for the Northern District of Illinois. The complaint alleged claims based on (1) negligence, (2) breach of warranty, and (3) strict liability, all arising out of the defect in the engine which resulted in the in-flight fire. Plaintiff prayed for damages to cover the costs of repair of the engine and the airframe, lost revenues from cancelled flights and recovery of settlement fees paid to passengers on their personal injury claims against plaintiff.

Asserting the economic loss doctrine as a bar to plaintiff's tort claims, defendant moved for summary

judgment. Defendant's motion was allowed in part and denied in part. See *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 836 F. Supp. 541 (N.D. Ill. 1993). Plaintiff subsequently motioned the court to reconsider the earlier ruling denying tort recovery of lost revenue and engine repair costs. Upon reconsideration, the court held that plaintiffs in Illinois may recover purely economic losses, including lost revenue and engine repair costs, if plaintiffs proved that (1) the product failed suddenly and calamitously, and (2) that the failure caused at least some economic losses. See *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 875 F. Supp. 522 (N.D. Ill. 1995).

The case was subsequently set for trial. Prior to commencement of trial, however, the parties requested that the district court certify for interlocutory review the question whether defendant's gas turbine engine and the Aerospatiale airframe were an integrated unit of the plaintiff's airplane under the economic loss doctrine as set forth in the United States Supreme Court's opinion in *East River Steamship Corp. v. Transmerica Delaval, Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986). The question was then certified to the Seventh Circuit Court of Appeals (28 U.S.C. § 1292(b) (1994)), and that court agreed to accept the appeal. See *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 86 F.3d 725, 729 (7th Cir. 1996).

The court of appeals found that the scope of Illinois' economic loss doctrine was determinative of plaintiff's contract and tort claims. The court perceived, however, that there was a need for the Illinois Supreme Court to authoritatively decide issues concerning the distinction between property damage and economic loss. Accordingly, the court of appeals certified three questions to this court. See *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 86 F.3d 725 (7th Cir. 1996).

Certification of Questions of State Law

Our Rule 20 permits the United States Court of Appeals for the Seventh Circuit to certify a question of Illinois law to the Supreme Court of Illinois, which question may be controlling in an action pending before the Court of Appeals and upon which no controlling Illinois authority exists. 145 Ill. 2d R. 20.

## DISCUSSION

This court's 1982 opinion in *Moorman* continues to generate questions concerning the scope of the economic loss doctrine. Our answers to the Seventh Circuit's certified questions will further define the parameters and operation of the doctrine in Illinois.

As an initial matter, we note that defendant's assertion that Illinois does not recognize a sudden and calamitous occurrence as an exception to the economic loss doctrine is only partially correct. In *Moorman*, this court adopted the following definition of economic loss: " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to *other* property.' " (Emphasis added.) *Moorman*, 91 Ill. 2d at 82, quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966). Recently, in *In re Chicago Flood Litigation*, which like this case was presented to us with certified questions on the parameters of *Moorman*, we made clear that Illinois recognizes three exceptions to *Moorman*'s economic loss rule: (1) where the plaintiff sustains damage, *i.e.*, personal injury or property damage, *resulting from a sudden or dangerous occurrence;* (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others

in their business transactions. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 186-87 (1997), citing *Moorman*, 91 Ill. 2d at 86-89; see also *In re Illinois Bell Station Litigation*, 161 Ill. 2d 233, 240 (1994). "[T]he event, by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage." *In re Chicago Flood Litigation*, 176 Ill. 2d at 200.

The questions posed to us today involve construal of the first of the *Moorman* exceptions—the personal injury or property damage exception.

### Damage to the Product Itself

The first question presented for our consideration is whether there can be tort recovery when the damage caused by a defective product is confined to the product itself. Phrased differently, the question is simply whether damage to the product itself constitutes economic loss or *Moorman* property damage.

Generally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss. Personal injury is, of course, self-explanatory. In Illinois, property damage has been understood to include either damage to the defective product itself, or damage to other property. See *Vaughn v. General Motors Corp.*, 102 Ill. 2d 431 (1984) (applying *Moorman* to permit tort recovery for damage to the product itself). We have not, since our decision in *Vaughn* and the Supreme Court's later decision in *East River*, however, addressed with particularity whether the sudden and calamitous occurrence/property damage exception continues to apply to cover damage to the product itself.

To answer the first of the certified questions, we necessarily begin our analysis at the beginning—with a review of the analysis and holdings in *Moorman*. In

*Moorman,* the plaintiff purchased a grain storage tank from the manufacturer, National Tank. After several years, a crack appeared in one of the tank's steel plates. The plaintiff brought suit on a variety of claims, including strict liability in tort and negligence. The plaintiff sought damages representing the cost of repairs and loss of use of the tank.

Relying on Justice Traynor's analysis in *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), this court noted the distinction between strict liability in tort and warranty rules. The court found that plaintiff's complaint was not that the tank was unreasonably dangerous, but that it had failed to live up to the plaintiff's expectations. As such, the court concluded that the plaintiff sought to recover the benefit of its bargain, an interest protected not by tort law but by contract law.

The plaintiff, asserting that recovery for economic loss was not being sought, argued that he should be permitted tort recovery because a "product defect existed [in the tank] that posed an 'extreme threat to life and limb, and to property of plaintiff and others, a defect which resulted in a sudden and violent ripping of plaintiff's tank.' " *Moorman*, 91 Ill. 2d at 82.

In response to the plaintiff's tort claim, this court noted its agreement with the rationale expressed in *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3d Cir. 1981), which allowed tort recovery for damages arising out of a sudden and dangerous occurrence which posed a serious risk and damaged the product itself, a front end loader. The *Moorman* court, however, distinguished *Pennsylvania Glass*, finding that the damage to the tanks (*Moorman*), unlike the damage to the front end loader (*Pennsylvania Glass*), was not the type of sudden and dangerous occurrence best served by the policy of tort law. *Moorman*, 91 Ill. 2d at 85.

The court in *Moorman* held that where only the defective product is damaged, economic losses caused by the qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory. By its holding, *Moorman* firmly established that plaintiffs suffering purely economic losses from defective products may not avoid the regulatory scheme of the Uniform Commercial Code by suing in tort. Note, *The Problem of Economic Damages: Reconceptualizing the Moorman Doctrine*, 1991 U. Ill. L. Rev. 1169, 1180-81. More than that, however, *Moorman*'s reliance on *Pennsylvania Glass* set the stage for the allowance of tort recovery for sudden and calamitous occurrences which cause damage to the product itself. See C. Chapman & T. Hoffman, Product Liability in Illinois VIII—1 (1993); D. Bland & R. Watson, *Property Damage Caused by Defective Products: What Losses are Recoverable?*, 9 Wm. Mitchell L. Rev. 1, 10 n.52 (1983).

A few short years after *Moorman*, this court decided *Vaughn*, which purports to be a direct application of *Moorman*'s sudden and calamitous occurrence/property damage exception. Before considering *Vaughn*, however, we pause to more closely consider the analysis and holding in *Pennsylvania Glass*.

As we have stated, *Pennsylvania Glass*, 652 F.2d 1165, involved damage to a front end loader which occurred as the result of a fire—a sudden and dangerous occurrence, caused by an alleged defect that posed a serious risk of harm to people and property. The court there was squarely confronted with the question of whether accidental damage to the product itself should be regarded as economic loss recoverable only in contract warranty law.

The court first gave recognition to the fact that economic loss frequently involves only damage to the defec-

tive product itself, with no attendant injury to persons or other property. *Pennsylvania Glass*, 652 F.2d at 1171. Further, the court acknowledged the difficulty in classifying situations in which the product alone is damaged as properly falling within the confines of either tort or contract. Proper characterization of the damage as either tort or contract, the court held, required analysis of "interrelated factors such as [1] the nature of the defect, [2] the type of risk, and [3] the manner in which the injury arose." *Pennsylvania Glass*, 652 F.2d at 1173.

Applying its factors test, the *Pennsylvania Glass* court determined that the complaint fell within the policy of tort law. Underlying the court's disposition was the notion that tort law imposes a duty on manufacturers to produce safe items, regardless of whether the ultimate impact of the hazard is on people, other property, *or the product itself.*

*Moorman*'s acceptance of *Pennsylvania Glass'* analysis provided fertile soil in which the holding in *Vaughn* is rooted. In *Vaughn*, the plaintiff filed a complaint against both the manufacturer and the dealer of a truck which the plaintiff had purchased. Plaintiff alleged that the brakes on the truck had locked, causing the truck and its load to overturn. Plaintiff sought recovery to compensate him for the loss of the truck, expenses incurred in renting another truck, extra time expended at work, cleanup of the spilled fuel, expenditures for brake repairs prior to the occurrence, and the cost of the repair of a bulk fuel tank being carried on the truck at the time. *Vaughn v. General Motors Corp.*, 118 Ill. App. 3d 201 (1983).

The appellate court held that if a defect in a product "creates a dangerous condition and causes damages of a sudden and calamitous nature, the loss, even if it is limited to the product itself, is considered property damage and the injured party has a tort action." *Vaughn*,

118 Ill. App. 3d at 204. In so deciding, the appellate court relied largely on *Moorman*'s acceptance of *Pennsylvania Glass* and Dean Prosser's analysis of liability for property damage. See W. Prosser, Torts § 101, at 665 (4th ed. 1971). This court affirmed the appellate court. *Vaughn*, 102 Ill. 2d at 436.

Incidentally, plaintiff offers *Vaughn* as dispositive of the first certified question and would, therefore, end the analysis here. Plaintiff notes that *Vaughn* continues to be the law in Illinois and, further, that that case has been cited with approval in other jurisdictions. Defendant counters that *Vaughn* is inapposite because the damage in that case occurred to "other property"—the bulk fuel tank.

This court, in *Vaughn*, made no express distinction between other property damage and damage to the product itself. Neither did this court reject the appellate court's characterization of the damage as being to the product itself. We are therefore inclined to treat the case as one standing for the proposition that when a defect in the product causes a sudden and calamitous occurrence damaging the product itself tort recovery is available. That said, we hasten to add that the evolution of the economic loss doctrine in Illinois and in other jurisdictions requires our reconsideration of the holding in *Vaughn* and particularly what constitutes *Moorman* property damage.

Until the Supreme Court's decision in *East River*, *Vaughn* continued to be on solid footing. In *East River*, an admiralty case, the Court decided whether there could be tort recovery on a theory of products liability where the damage caused by the defect was confined to the product itself. Central to the Court's analysis was the notion that warranty and product liability should protect different interests. The Court noted that in the traditional " 'property damage' " cases, the defective

product damages other property. *East River*, 476 U.S. at 867, 90 L. Ed. 2d at 874, 106 S. Ct. at 2300. A commercial product's damaging itself, however, is not the kind of harm that public policy requires manufacturers to protect against without contractual obligation. The Court reasoned that whether the damage to the product itself resulted from gradual deterioration or internal breakage or from a calamitous occurrence, in either case, since no person or other property is damaged, the resulting loss is purely economic. *East River*, 476 U.S. at 870, 90 L. Ed. 2d at 876, 106 S. Ct. at 2302.

Further, the Court opined, when a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong. *East River*, 476 U.S. at 871, 90 L. Ed. 2d at 877, 106 S. Ct. at 2302. Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations or, in other words, that the customer has received " 'insufficient product value.' " *East River*, 476 U.S. at 872, 90 L. Ed. 2d at 877, 106 S. Ct. at 2302, citing J. White & R. Summers, Uniform Commercial Code 406 (2d ed. 1980).

The Court in *East River* expressly rejected *Pennsylvania Glass*' three-factor test, or, as it is currently characterized, the intermediate approach, leading the Third Circuit to overrule the later decision in *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110 (3d Cir. 1987). Aligning itself with the approach taken in *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), the Court reasoned that a manufacturer in a commercial relationship has no duty under either a negligence or a strict products liability theory to prevent a product from injuring itself. *East River*, 476 U.S. at 871, 90 L. Ed. 2d at 877, 106 S. Ct. at 2302.

The broadest holding in *East River* is that tort

recovery is not available for purely economic loss. That holding is not inconsistent with Illinois law or, in particular, with *Vaughn.* See *In re Chicago Flood Litigation,* 176 Ill. 2d at 198-99. However, in 1989 this court decided *Board of Education v. A, C & S, Inc.,* 131 Ill. 2d 428 (1989). *A, C & S,* aligning itself with *East River,* expressly rejects *Pennsylvania Glass,* which, as we have stated, provided the basis for *Vaughn's* damage to the product itself tort recovery.

Although *A, C & S* cites approvingly to the *East River* decision, because *A, C & S* is an other-property case, the court there was not required to and did not at that time authoritatively decide whether damage to the product itself continues to constitute *Moorman* property damage. Notably, *Vaughn* is cited in *A, C & S* without reproof. It therefore remains subject to question whether, after *East River's* and *A, C & S's* approval thereof, damage to the product itself may continue to constitute property damage for purposes of tort recovery, as this court held in *Vaughn.*

Before addressing that issue we pause to clarify a seeming inconsistency in *A, C & S. A, C & S* analyzed the availability of tort recovery for injury caused by the existence of asbestos in several Illinois school buildings. In that case, the plaintiffs, seeking to bring their claim within the bounds of tort recovery, asserted that, pursuant to *Moorman,* an "allegation of risk" was relevant to the tort versus contract determination. *A, C & S,* 131 Ill. 2d at 442.

The *A, C & S* court rejected a "risk analysis" as relevant in the determination, noting instead that the test in Illinois continues to require consideration of only two factors: (1) the nature of the defect and (2) the manner in which the injury occurs. *A, C & S,* 131 Ill. 2d at 441, 442-43. The court acknowledged that the "risk analysis" approach to tort/contract determinations had its origin

in *Moorman*'s "approval" of *Pennsylvania Glass*. However, *A, C & S* read *Moorman*'s "approval" as being limited to the proposition that a tort action was not proper when seeking recovery for economic losses alone. *A, C & S*, 131 Ill. 2d at 443. Further, *A, C & S* stated that this court had previously rejected *Pennsylvania Glass*' intermediate approach. *A, C & S*, 131 Ill. 2d at 445. See also *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146, 151 (1986) (discussing economic loss doctrine generally and citing, with approval, the holding in *East River*).

It appears that *A, C & S* viewed *Pennsylvania Glass*' intermediate approach to making the tort/contract determination as consisting solely of a "risk analysis." In retrospect, however, we recognize that although the determination under the intermediate approach "essentially turn[s] on the degree of risk" (see *East River*, 476 U.S. at 870, 90 L. Ed. 2d at 876, 106 S. Ct. at 2301), that approach includes also consideration of two additional factors—the nature of the defect and the manner in which the injury occurred. See *Pennsylvania Glass*, 652 F.2d at 1173.

Illinois' two-factor test (nature of defect and manner of occurrence) for making the tort/contract determination arose out of and is incorporated as a part of *Pennsylvania Glass*' three-factor, or intermediate, approach. Thus, *A, C & S*'s simultaneous rejection of the intermediate approach (*A, C & S*, 131 Ill. 2d at 445) and retention of the two-factor test (*A, C & S*, 131 Ill. 2d at 441) would appear inconsistent. See *Trans States Airlines*, 86 F.3d at 730-31. As the court viewed the intermediate approach as consisting solely of the "risk analysis," rejection of the intermediate approach was apparently perceived and intended to eliminate consideration of the degree of risk only. Consistent with *A, C & S*, we reiterate that the proper test for distinguishing

tort and contract is (1) the nature of the defect and (2) the manner in which the injury occurred.

That said, we return to consider the proper redress for damage to the product itself. Whether to allow tort recovery when the damage is confined to the product itself involves consideration of the policies which underlie tort recovery generally, and products liability in particular. As an aid in our determination, we have considered those policies as well as the three prevailing approaches on this issue. See Annotation, *Strict Products Liability: Recovery for Damage to Product Itself*, 72 A.L.R.4th 12 (1989).

*East River*, which represents the "majority approach," finds its basis to deny tort recovery for injury to the product itself in the reasoning of *Seely*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965). *Seely* held that preserving a proper role for the law of warranty precludes imposing tort liability if a defective product causes purely monetary harm.

Courts following the majority approach maintain that the goals of tort theories of recovery simply are not implicated in a product malfunction case involving only economic losses. Damage to the product itself only means that the product has not met the customer's expectations, or that the customer did not receive the benefit of his bargain. See *East River*, 476 U.S. at 872, 90 L. Ed. 2d at 877, 106 S. Ct. at 2302. A contract action recognizes the parties' abilities to structure their relative liabilities and expectations regarding the product's performance by setting the terms of their contractual bargain. *REM Coal Co. v. Clark Equipment Co.*, 386 Pa. Super. 401, 563 A.2d 128 (1989). Losses resulting from damage to the product itself caused by the product's failure to function properly can be recovered only through an action for breach of warranty. Note, *Asbestos in Schools and the Economic Loss Doctrine*, 54 U. of Chi.

L. Rev. 277, 286 (1987). See, *e.g., Richard O'Brien Cos. v. Challenge-Cook Bros., Inc.,* 672 F. Supp. 466 (D. Colo. 1987); *Public Service Co. v. Westinghouse Electric Corp.,* 685 F. Supp. 1281 (D.N.H. 1988); *McConnell v. Caterpillar Tractor Co.,* 646 F. Supp. 1520 (D.N.J. 1986); *Dairyland Insurance Co. v. General Motors Corp.,* 549 So. 2d 44 (Ala. 1989); *Nelson v. International Harvester Corp.,* 394 N.W.2d 578 (Minn. App. 1986); *Sharp Brothers Contracting Co. v. American Hoist & Derrick Co.,* 703 S.W.2d 901 (Mo. 1986); *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649 (Okla. 1990); *REM Coal Co.,* 386 Pa. Super. 401, 563 A.2d 128; *Continental Insurance v. Page Engineering Co.,* 783 P.2d 641 (Wyo. 1989).

A second approach is the *Pennsylvania Glass,* or, as it is generally referred to, the "intermediate approach." As we have stated, the intermediate approach essentially turns on the degree of risk involved and would allow recovery despite the fact that the risk is never realized. See, *e.g., Fordyce Concrete, Inc. v. Mack Trucks, Inc.,* 535 F. Supp. 118 (D. Kan. 1982) (applying Kansas law); *Capitol Fuels, Inc. v. Clark Equipment Co.,* 181 W. Va. 258, 382 S.E.2d 311 (1989). The approach actually embodies the sudden and dangerous test, which is based on the rationale that sudden and dangerous accidents pose a greater safety risk to both persons and property than do simple product defects and so are properly actionable in tort. See Note, *Asbestos in Schools and the Economic Loss Doctrine,* 54 U. of Chi. L. Rev. 277, 288-89 (1987). Courts following the intermediate approach attempt to differentiate between the " 'disappointed users *** and the endangered ones.' " *East River,* 476 U.S. at 869-70, 90 L. Ed. 2d at 876, 106 S. Ct. at 2301, quoting *Russell v. Ford Motor Co.,* 281 Or. 587, 595, 575 P.2d 1383, 1387 (1978).

Third, some courts have taken the "minority ap-

proach," holding simply that any injury to the defective product itself is compensable regardless of whether it created an unreasonable risk of harm. *East River*, 476 U.S. at 868-69, 90 L. Ed. 2d at 875, 106 S. Ct. at 2301 (citing cases). Based on the reasoning in *Santor v. A&M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), these courts believe that the responsibility of a manufacturer should be no different where the product damages itself or other property. In *Santor*, recovery turned not on the type of harm suffered, but on an inquiry into whether the defendant's conduct was the originating cause of that harm.

Under the minority approach, regardless of whether the damage is economic loss or personal injury or property damage, all are proximately caused by the defendant's conduct. See *East River*, 476 U.S. at 869, 90 L. Ed. 2d at 876, 106 S. Ct. at 2301. These courts reject as arbitrary the distinction between injuries to persons and other property (physical harm) and injury to the defective product itself (economic loss). The type of damage does not change the manufacturer's wrongful conduct. See also Note, *Asbestos in Schools and the Economic Loss Doctrine*, 54 U. of Chi. L. Rev. 277, 286-90 (1987) (citing cases); see also Note, *The Problem of Economic Damages, Reconceptualizing the Moorman Doctrine*, 1991 U. of Ill. L. Rev. 1169, 1176.

The vast majority of jurisdictions now follow *Seely* or the *East River* approach. See Note, *The Problem of Economic Damages: Reconceptualizing the Moorman Doctrine*, 1991 U. of Ill. L. Rev. 1169, 1177 n.78 (citing cases). We find the *East River* approach highly persuasive and are inclined to follow it. Before so concluding, however, we must consider whether that approach comports with the particular policies which underlie the law of products liability in Illinois.

The purpose of strict liability in tort is to place the

loss caused by defective products on those who create the risks and reap the profits by placing such products in the stream of commerce. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.*, 62 Ill. 2d 77, 82 (1975). The rationale underlying this liability is three-fold: (1) the public interest in human life and safety demands broad protection against the sale of defective products; (2) the manufacturer solicits and invites the use of his products by representing that they are safe and suitable for use; and (3) the losses caused by defectively dangerous products should be borne by those who have created the risks and reaped the profits by placing the products into commerce. *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 619 (1965); see also 14 Ill. Jur. *Personal Injury and Torts* § 33:1 (1994).

Critics of the *East River* approach assail it as unjustifiably dismissive of the safety concerns upon which products liability is grounded. They reason that if manufacturers can contract successfully around liability for product injuries, a principal deterrent to unsafe practices—the threat of legal liability—will be lost. See, *e.g.*, *Washington Water Power Co. v. Graybar Electric Co.*, 112 Wash. 2d 847, 863, 774 P.2d 1199, 1208-09 (1989); accord *Vulcan Materials Co. v. Driltech Inc.*, 251 Ga. 383, 387, 306 S.E.2d 253, 257 (1983).

We disagree. We note as an initial matter that where the product damages itself only, the harm that products liability law is designed to protect against is not realized. Thus, products liability safety concerns are not compromised.

Further, we believe that the incentive to manufacture safe products remains unabated under the *East River* approach. Like other states which have chosen to follow *East River*, we conclude that the rules which permit recovery in negligence and strict liability for damage to other property or for personal injury ad-

equately serve this important social function. See *Continental Insurance*, 783 P.2d at 648-49.

Specifically, acceptance of *East River*'s approach merely exempts damage to the product itself from the broad category of property damage. Where the product causes personal injury or other property damage, the manufacturer may yet be subject to liability in tort. Because no manufacturer can predict with any certainty that the damage his unsafe product causes will be confined to the product itself, tort liability will continue to loom as a possibility. Therefore, in our view, the incentive to build safe products is not diminished.

Furthermore, strict products liability arose out of a concern that consumers and remote parties are not on an equal footing with the manufacturer or seller to bargain effectively for the allocation of risk. However, when commercial parties of equal bargaining power enter into a contract which either expressly allocates the risk or by omission is allocated under the terms of article 2 of the Uniform Commercial Code (see 810 ILCS 5/2—101 *et seq.* (West 1994)), this concern does not apply. See *Sharp Brothers*, 703 S.W.2d 901; *REM Coal Co.*, 386 Pa. Super. 401, 563 A.2d 128.

Incidentally, we recognize that some jurisdictions make a distinction between commercial transactions and consumer transactions, allowing tort recovery for consumer transactions. When the dispute is between commercial parties, most courts refuse to allow negligence or strict tort recovery for damage to the product itself. W. Keeton, Prosser & Keeton on Torts § 101 n.14.5 (5th ed. Supp. 1996). See, *e.g.*, *Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499 (D. Md. 1990) (buyers and manufacturer of yacht destroyed by fire in "consumer relationship" rather than "commercial relationship" and therefore buyers could maintain action in tort against manufacturer for purely economic loss); *cf.*

*Utah International, Inc. v. Caterpillar Tractor Co.*, 108 N.M. 539, 775 P.2d 741 (1989) (in commercial transaction where there was no great disparity in bargaining of parties, economic losses from injury of product itself not recoverable in tort); but see *Wellcraft Marine v. Zarzour*, 577 Só. 2d 414 (Ala. 1990) (under Alabama's extended manufacturer's liability doctrine, no recovery for damage to product itself regardless of whether product is sold to consumer or commercial buyer); see also Note, *Products Liability in Commercial Transactions*, 60 Minn. L. Rev. 1061 (1976). The cause before us involves a purely commercial transaction. Although we are not now persuaded that the consumer/commercial transaction distinction makes any difference when the product damages only itself, we express no opinion in that regard.

Additionally, we believe that the policy question presented here was properly addressed by Dean Prosser as follows:

> "It has been held that if a dangerously defective product causes an accident, then any loss resulting from that accident, including damage to the product itself, should be recoverable on a theory of strict liability in tort. Although this is a reasonable position, the risk of harm to the product itself due to the condition of the product would seem to be a type of risk that the parties to a purchase and sale contract should be allowed to allocate pursuant to the terms of the contract. This is especially so as regards transactions involving commercial or industrial products. Therefore, contract law and the rules pertaining to contract restrictions on warranty liability should control rather than the rules and principles of tort law." W. Keeton, Prosser & Keeton on Torts § 101(3), at 708-09 (5th ed. 1984).

Consistent with the views expressed in *East River*, Dean Prosser states that the policy considerations dictating strict liability in tort for dangerously defective products are not subverted so long as the seller is held

strictly accountable for physical harm to persons and tangible things other than the defective product itself. W. Keeton, Prosser & Keeton on Torts § 101(3), at 709 (5th ed. 1984).

In the context of damage to the product itself, we find additional reasons to follow the *East River* approach. *East River* eliminates the conceptually difficult problem of distinguishing damage caused by an accident to the product itself from that caused by ordinary wear and tear. In the case of personal injury or other property damage, however, we continue to require, for purposes of tort recovery, the coupling with a sudden and calamitous occurrence. In those instances, our strong interest in keeping the spheres of tort and contract separate outweighs the difficulties in making the deterioration versus calamitous occurrence distinctions.

Further, the tort rationale of risk distribution and the doctrine of assumption of the risk, while appropriate in personal injury cases, seem wholly inappropriate when the injury is only to the product itself. "It would indeed be ironic if the tort doctrine which was evolved to rescue the personal injury area from the 'intricacies of the law of sales' were to imprison the economic loss area with inapposite tort concepts." Note, *Manufacturers' Liability To Remote Purchasers For "Economic Loss" Damages—Tort or Contract?*, 114 U. of Pa. L. Rev. 539, 549 (1966).

After considering the purposes and policies which underlie products liability law, we are persuaded that the *East River* approach is the better reasoned one. In sum, when the product damages itself only, the risks against which products liability law was designed to protect simply are not realized. Additionally, to follow *East River* will not result in manufacturers' losing their incentive to make safe products; therefore, our strong

interest in human life and safety is not compromised. Further, the *East River* approach better serves our interest in preserving the distinction between tort and contract. Therefore, and consistent with *East River*, we answer the inquiry as to whether there may be tort recovery for damage to a single product resulting from a sudden and calamitous event in the negative. To the extent that *Vaughn* is inconsistent with this holding, it is overruled.

### One Product or Two?

The second and third questions certified to this court are: (2) "Can a product and one of its component parts ever constitute two separate products[?]" and (3) "[D]id the airframe and the engine that failed in this case constitute a single product or two distinct products?" If the engine constitutes a single product separate from the airframe, plaintiff's cause may fall within *Moorman*'s property damage exception.

In this case, the engine caused damage to itself as well as to the airframe in which it was housed. Plaintiff, citing *East River*, concedes that the engine with its faulty bolts constituted a single integrated product, but claims that the engine and the airframe constitute two separate products. Defendant takes the contrary position concerning the engine and airframe. We agree that the engine, an integrated product complete with bolts, constituted a single product. See *East River*, 476 U.S. at 867, 90 L. Ed. 2d at 874, 106 S. Ct. at 2300. What remains is whether the engine and its airframe constitute two separate products.

Prior to addressing that issue, we note plaintiff's argument that where there is "other property" damage, there is no additional requirement under *Moorman* that the damage have been the result of a sudden and calamitous occurrence. In support, plaintiff cites to language in *A, C & S*, which states that to prevent

recovery in tort merely because the physical harm did not occur suddenly would defeat the underlying purposes of strict products liability.

Significantly, *A, C & S* is an asbestos case. The court there, prior to rejecting the sudden and dangerous occurrence requirement, noted that asbestos damages do not easily fit within the framework delineating tort and contract. Further, the court stated that, *in that instance*, the critical inquiry was whether the product had an unreasonably dangerous defect and whether the defect caused the property damage alleged. We do not read the proffered language in *A, C & S* as a wholesale rejection of the "sudden and calamitous" requirement for other property cases. Clear from the language is that the court was attempting to confine its reasoning to the particular facts of the case.

As we pointed out in response to defendant's version of the property damage exception, *Moorman* requires a sudden and calamitous event coupled with personal injury or other property damage. Neither (1) an injury (personal injury or other property damage) standing alone nor (2) a sudden and calamitous occurrence standing alone is sufficient to bring a claim within the bounds of tort recovery. *In re Chicago Flood Litigation*, 176 Ill. 2d at 200.

Concerning the separate-products question, plaintiff largely argues that the manner in which the parties treated the products should be dispositive. In this case, the parties treated the engine and the airframe as two separate products. Following a "separate-treatment" approach, plaintiff contends that damage to the airframe by the engine must be considered damage to other property.

Plaintiff offers the following facts as evidence of how the engine and airframe were treated. The engines are type certificated at Pratt & Whitney separate and apart

from the airframe type certification; each engine receives an airworthiness certificate separate and apart from the airframe airworthiness certificate; the engine comes with its own maintenance, parts, and service publication manuals prepared by Pratt & Whitney which are separate from the airframe manuals; each engine has its own logbook into which engine maintenance entries are recorded and which is kept independently of the airframe maintenance logbook; the engine came with its own warranty issued by Pratt & Whitney which is separate and distinct from the airframe warranty; each engine has its own title documentation separate and apart from the airframe; and service publications and bulletins for the engine are the responsibility of Pratt & Whitney.

Additionally, pursuant to the terms under the sublease agreement, each PW120 engine is interchangeable with any other of the same model type; at the end of the lease period, the airframe need not be returned with the same engines that were attached to the airframe when it first arrived. Given these facts, plaintiff maintains, the engine and airframe should be considered separate products.

Notably, the separate treatment of the engines in this case was not solely the result of the manner in which defendant conducted business. The fact that the engine could be interchanged with other engines or that the aircraft could be returned to GPA with different engines was a provision in the sublease which plaintiff negotiated with GPA, not with defendant. Incidentally, we recognize that plaintiff was not a party to the sales agreement between the airframe manufacturer, Aerospatiale, and defendant, Pratt & Whitney Canada, and, therefore, plaintiff had no opportunity to negotiate the allocation of risks with defendant. However, plaintiff was not similarly foreclosed from negotiating and al-

locating particular risks in the sublease agreement with GPA.

Defendant, citing to several cases in support, argues that the proper focus of a separate-products, or "other-property," inquiry should be on what the parties bargained for. Defendant contends that plaintiff in this case bargained for and received a fully integrated aircraft, complete with engine. The two are joined together physically and conceptually and should be treated as one product.

Plaintiff counters that defendant's cases are factually distinguishable because, unlike in this case, those cases do not involve a scheduled airline with a pool of common engines which are easily removed and reinstalled on similar airframes for maximum utilization and maintenance coordination. Plaintiff maintains that a determination as to whether a product constitutes "other property" should turn simply on how the parties treated the product or products.

It may well be that defendant's cases are distinguishable due to the manner in which different airlines operate. That notwithstanding, though the defective engine in this case was interchangeable, it appears from the complaint that the engine was in fact the same engine which was delivered and installed in the aircraft at the time plaintiff entered into its sublease agreement with GPA. Further, as we have stated, the interchangeability of engines was a part of plaintiff's sublease agreement with GPA, not with defendant. Thus, even accepting the offered distinction, it is of no benefit to this plaintiff.

Furthermore, we find plaintiff's "separate-treatment" approach, which is unsupported by any authority, problematic for at least three reasons. First, most products, like the aircraft in this case, are comprised of components, many of which are capable of removal and interchangeability. If the capability to

remove or interchange is determinative of the separate-products inquiry, then practically every component of every product would be considered a separate product. Second, plaintiff's approach creates the potential for difficult factual determinations concerning the degree of separate treatment. For instance, would the fact that the engines in this case came with separate manuals and warranty be sufficient to conclude separate treatment, or must there be several factors in combination, and if so, how many? Third, and although we are not told here, in this case it is conceivable that some of defendant's treatment of the engines was in satisfaction of the dictates of a particular regulatory agency as opposed to the manner in which defendant chose to conduct business. Given these concerns alone, the "separate-treatment" approach is, to us, unappealing.

To aid us in our determination on this question, we have reviewed cases from several jurisdictions. In *S.N.A. Inc. v. Hartzell Propeller, Inc.*, No. 95—1397 (E.D. Pa. May 29, 1996) (applying Pennsylvania law), a faulty valve had been attached to a propeller and the propeller was then attached to the plaintiff's plane. The valve caused damage to itself as well as to the aircraft. In rejecting the economic loss doctrine as applicable to bar tort recovery, the plaintiff argued that the allegedly defective propeller system damaged "other property," namely, the aircraft onto which it had been incorporated.

Following the reasoning in *King v. Hilton Short-Davis*, 855 F.2d 1047, 1052 (3d Cir. 1988), the court in *S.N.A.* held that to determine whether a defective product caused damage to "other property" the court must focus on the injured party's bargained-for expectation. The court determined that the lease was the relevant bargain and, pursuant to its terms, plaintiff bargained for an aircraft. Since plaintiff S.N.A. lost no more than

it bargained for in that lease—use of a prototype aircraft—S.N.A. was barred from recovering lost profits under the economic loss doctrine. But see *Lease Navajo, Inc. v. Cap Aviation, Inc.*, 760 F. Supp. 455 (E.D. Pa. 1991) (where defendant purchased component parts for installation on engines from third-party defendant, as opposed to purchasing engines as a whole, damage to components, engines and aircraft considered other property damage for purposes of tort recovery).

Similarly, in *American Eagle Insurance Co. v. United Technologies Corp.*, 48 F.3d 142 (5th Cir. 1995) (applying Texas law), the defendant manufactured and sold an aircraft engine to the Cessna aircraft company. Subsequent to the engine's installation, Cessna sold the aircraft to the Federal Express Corporation. The aircraft was then sold to Martinaire, Inc.

The airplane subsequently crashed and was destroyed. There were no personal injuries; however, there was damage on the ground to property owned by a third party. A service policy between Federal Express and Pratt & Whitney Canada, Ltd., disclaimed implied warranties, liability in tort and contract, and limited remedies to repair or replacement. The policy also contained an express warranty against defects in the engine which had previously expired.

The court held that had the parties bargained for separate components making up the aircraft, then the individual defective component parts could be perceived as having caused damage to the whole. However, there was no evidence that the parties had bargained separately for individual components. Consequently, the aircraft hull did not qualify as "other property" damaged by the defective engine component. *American Eagle*, 48 F.3d at 144-45. See also *National Union Fire Insurance Co. v. Pratt & Whitney Canada, Inc.*, 107 Nev. 535, 815 P.2d 601 (1991) (where buyer did not purchase

airplane and engine separately, but rather had bought single integrated product, economic loss doctrine barred airplane lessor's tort suit against manufacturer of defective engine, despite damage to entire plane caused by engine failure); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925 (5th Cir. 1987) (parties had not bargained separately for vessel's defective steering mechanism; therefore, defective components making up vessel as a whole could not cause "other property" damage); *cf. Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft, A Division of United Technologies Corp.*, 849 F. Supp. 666 (E.D. Wis. 1994) (applying "integrated system test," court held where defendant provided whole helicopter, damage to helicopter by defective tail rotor drive did not constitute other-property damage).

Not all courts, however, follow the "product bargained-for approach" in making "other-property" determinations. Under Ohio law, "a product's self-inflicted damage is by definition 'property damage.' " *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.*, 42 Ohio St. 3d 40, 44, 537 N.E.2d 624, 630 (1989). In determining whether damage to the product constitutes economic loss, Ohio focuses not on the nature of the product and its components, but rather on the relationship between the parties. See *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.*, 42 Ohio St. 3d 40, 44, 537 N.E.2d 624, 630 (1989). Where there is privity of contract and the parties have negotiated that contract from relatively equal bargaining positions, the parties are able to allocate the risk of all loss, including loss of the subject product itself, between themselves. *Chemtrol Adhesives*, 42 Ohio St. 3d at 45, 537 N.E.2d at 631.

*Epps Flying Services, Inc. v. Hartzell Propeller Inc.*, No. 94—4863 (E.D. Pa. October 13, 1995) (applying Ohio law), is exemplary of the "privity" approach. There, the

plaintiff alleged damages to his aircraft caused by defendant's defective propeller. The district court held that under the Ohio Supreme Court's characterization, plaintiff's losses constituted property damage. Because the parties were not in privity of contract, the property damage was potentially recoverable in a negligence action.

Still some other courts, as in *Pennsylvania Glass*, make no distinction between damage to the product itself and other property damages. The relevant inquiry for tort recovery in those cases is whether damage to the property was from an unreasonably dangerous product. If so, tort recovery is permissible regardless of whether the damage was to the defective product or upon other property. See, *e.g.*, *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F. Supp. 118, 121 (D. Kan. 1982). Accord *Sunbird Air Services Inc., v. Beech Aircraft Corp., Pratt & Whitney Aircraft*, No. 89—2181—V (D. Kan. June 24, 1992) (applying Kansas law) (tort recovery permitted for defective fuel control unit installed in engine which was subsequently installed in and damaged aircraft); *Mississippi Power & Light Co. v. Branson Aircraft Corp.*, 797 F. Supp. 871 (D. Colo. 1992) (defective fuel tank which created unreasonably dangerous condition in aircraft resulted in property damage recoverable in tort).

Of the three approaches to the separate-products inquiry, we favor the "product bargained for" approach, which to us seems the most logical, fair and easy to apply. The privity approach is problematic because of the burdens it places on manufacturers, particularly in the context of consumer transactions where, more often than not, privity is absent. The unreasonably dangerous approach is simply a restatement of *Pennsylvania Glass*, which we have here expressly rejected.

Dean Prosser once characterized the law of products

liability as a "hybrid, having its commencement in contract and its termination in tort." W. Prosser, Law of Torts 648-51 (3d ed. 1964). We find it apt, therefore, that the proper starting point in the separate-products determination is the contract. The relevant inquiry is, What is the object of the contract or bargain that governs the rights of the parties? See *Shipco*, 825 F.2d at 928. In this case, we necessarily look to the sublease agreement which was the relevant bargain. See *S.N.A. Inc.*, No. 95—1397 (E.D. Pa. May 29, 1996). Interpretation of the terms of the agreement, as in the case of any written and unambiguous contract, presents a question of law. See *Hufford v. Balk*, 113 Ill. 2d 168, 172 (1986), citing *Chicago Daily News, Inc. v. Kohler*, 360 Ill. 351, 363 (1935); see also 12A Ill. L. & Prac. *Contracts* § 512, at 378 (1983); *Petroleum Helicopters, Inc. v. Avco Corp.*, 930 F.2d 389, 393 n.9 (5th Cir. 1991) (noting that the phrase "other property" is construed by looking to nature of contract between the parties and that such determination rests upon contractual interpretation, *i.e.*, a legal analysis, and not upon a separate factual determination).

Pursuant to article 2.01 of the sublease-agreement, plaintiff and GPA agreed to the sublease of "the Aircraft." Aircraft is defined in article 1 of the sublease agreement as follows:

" 'Aircraft' means the Airframe to be delivered and subleased hereunder together with the Engines initially installed on such Airframe when delivered and subleased hereunder or any Engine as defined herein ***."

Under the terms of the sublease agreement, plaintiff bargained for and received a fully integrated aircraft. Plaintiff did not bargain separately for an engine and separately for an airframe. Had plaintiff done so, then damage to the airframe by the engine could be perceived as damage to "other property." Plaintiff has lost no more than it bargained for in the sublease agreement.

Therefore, in this case, damage to the airframe caused by the defective engine constitutes damage to a single product.

Moreover, it seems reasonable to us that the economic loss doctrine should bar tort recovery when a defective product causes the type of damage one would reasonably expect as a direct consequence of the failure of the defective product. Given the foreseeable consequences that a defective engine would result in damage to the airframe, we believe that parties to the sublease agreement could have bargained in consideration of such risks. See *Hartford Fire Insurance Co. v. Huls America, Inc.*, 893 F. Supp. 465, 469 (E.D. Pa. 1995).

We therefore answer the certified question "Can a product and one of its component parts ever constitute two separate products" in the affirmative. However, we answer the certified question whether the airframe and the engine that failed in this case constituted two separate products in the negative.

*Certified questions answered.*

JUSTICE HEIPLE, concurring in part and dissenting in part:

I agree with Justice Harrison that it is inappropriate for this court to answer certified question number three because the question is primarily factual, not legal. I would express no opinion on this question. I therefore dissent only from that portion of the majority opinion which addresses question number three.

JUSTICE HARRISON, also concurring in part and dissenting in part:

I agree with the majority's conclusions regarding the first two certified questions. I disagree with its response to the third question, which asks whether the airframe and engine constitute a single product or are actually two distinct products.

As a preliminary matter, I question whether this court should even have addressed that question. Supreme Court Rule 20 (145 Ill. 2d R. 20) gives this court discretion to answer certified questions of law. Question three, however, does not present a legal question. What it asks us to do is apply the legal principle at issue in question two to the particular facts of this case. That is a matter the federal court should be able to manage without our help. The purpose of Rule 20 is to give the federal courts direction on unsettled questions of Illinois law, not to decide specific cases for them.

That aside, the majority's analysis is unpersuasive. Pratt & Whitney's engine was used with the airframe, but was not part of it. As the majority details, the engine was freely removable and interchangeable. It was separately certified and warranted and was maintained independently of the airframe. How the engine could reasonably be characterized as a mere component of the airframe under these circumstances I do not understand. The airframe and engine were, in fact, two separate products, as both of the two United States district judges who have thus far considered the issue correctly recognized.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.