# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-1711

AMERICAN UNITED LOGISTICS, INC. and
CENTRAL AMERICAN WAREHOUSING CO., INC.,

*Third-Party Plaintiffs-Appellants,*

*v.*

CATELLUS DEVELOPMENT CORPORATION, et al.,

*Third-Party Defendants-Appellees.*

No. 01-2310

NABISCO, INC.,

*Plaintiff-Appellant,*

*v.*

AMERICAN UNITED LOGISTICS, INC., et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 0763—**Elaine E. Bucklo**, *Judge.*

ARGUED JANUARY 25, 2002—DECIDED FEBRUARY 12, 2003

Before MANION, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.*  A warehouse that Nabisco, Inc. leased to store its products contained chemical residues which contaminated its packaged food products, and it sought to recover the replacement costs of those products. Nabisco sued those involved in the warehouse lease, construction, and floor finishing process, alleging that their negligence and breach of their duties to warn allowed chemicals to damage its property. American United Logistics ("AUL"), Nabisco's warehouse partner, and Central American Warehousing, AUL's affiliate, also filed suit against the property developer, contractor, and subcontractors, claiming breach of warranty and contract. The district court dismissed Nabisco's negligence and breach of duty to warn claims, finding that the economic loss doctrine barred tort recovery. Additionally, the court dismissed Central and AUL's claims, ruling that they did not have a right to enforce warranties issued by the property developer, contractor, and subcontractors. We affirm the judgment against Nabisco, reverse the judgments against Central and remand for further proceedings, and reverse in part and affirm in part the judgments against AUL and remand for further proceedings.

## I.  BACKGROUND

### A.  The Facts

Nabisco and AUL were warehousing partners for Nabisco's snack food products. Nabisco asked that AUL find additional warehouse space for snack food products, and they signed a "Public Warehouse Storage, Handling and Inventory Agreement" ("warehouse agreement"). Under the warehouse agreement, AUL agreed to provide warehouse space and other services for the storage and handling of Nabisco's bakery products. In addition, the warehouse agreement specifically required AUL to keep poisonous,

dangerous chemicals and foul odors in a separate part of the warehouse. Under the warehouse agreement, AUL's liability for any damage to Nabisco's property was limited to $1 million per occurrence.

AUL contacted Catellus Construction Corporation to find available warehouse space in Illinois. AUL told Catellus that the warehouse was for Nabisco and that it must be suitable for the storage of retail food products. According to the parties, Catellus expressed reservations about entering into the contract with AUL because AUL had only been in existence for a short time, and Catellus preferred to contract with AUL's affiliate, Central. Consequently, Catellus and Central signed a Single Tenant Industrial Lease (the "tenant lease") for warehouse space that Catellus already had under construction. Eight months earlier, Catellus had hired Krusinski Construction as the warehouse contractor. Krusinski in turn hired G.A. Blocker Grading Contractor, Inc. to excavate the subgrade underneath the concrete warehouse floor and Brandonisio Construction Corporation to prepare the concrete floor.

According to its contract with Krusinski, Brandonisio was supposed to use a finishing product known as Sonisil on the floor; instead Brandonisio used Cure & Seal, a different finishing product manufactured by Specco. Cure & Seal contains aromatic hydrocarbons, which are airborne chemicals that have a fragrance, odor, perfume, or scent. As a result of this error, Krusinski contracted with Artlow Systems, Division of Archem, Inc. to strip the floor and fix the sealant problems, but Krusinski failed to specify the stripping agent to be used to remove the finish. Artlow used a product called Arsolv, manufactured by Hydrite Chemical Company, to strip the floor, which also contains aromatic hydrocarbons.

Shortly after the floor finishing process was complete, Nabisco began using the warehouse. A month later, Nabisco

began receiving complaints from customers regarding a chemical odor and flavor in certain snack food products such as Chips Ahoy and Oreo cookies. Nabisco investigated and learned that the complaints were all related to products that had passed through the Illinois warehouse. Test results indicated that all Nabisco products stored in the warehouse that were wrapped in polypropylene were contaminated with aromatic hydrocarbons. The contamination made them unfit for sale but did not pose a health risk. These actions followed.

## B.  District Court Proceedings

### 1.  Nabisco's claims.

Nabisco sued AUL, Central, Catellus, Krusinski, Brandonisio, and Artlow, alleging negligence. In addition, Nabisco sued Specco and Hydrite claiming a breach of their duty to warn users of the effect of their products on polypropylene-packaged food products. Nabisco alleges that chemical emissions from the finishing products infiltrated its polypropylene-wrapped packaged goods as soon as these products entered the warehouse. Nabisco supports this argument by submitting evidence that no matter how long its products were in the warehouse, they were all contaminated by aromatic hydrocarbons. Furthermore, Nabisco proffers the testimony of experts who concluded that contamination occurred immediately. Nabisco seeks $30 million for the costs incurred as a result of the contamination, including the cost of testing the warehouse and recalling and destroying contaminated products.

In May 2000, Magistrate Judge Ashman recommended that Nabisco's negligence and duty to warn claims be dismissed, holding that Nabisco's claims were actually contractual disputes barred by the economic loss doctrine. District Judge Bucklo adopted the magistrate judge's findings and ruled that the contamination of Nabisco's

products was not a "sudden or calamitous" occurrence, and thus not exempt from the economic loss doctrine. The district court granted Nabisco leave to file its fourth amended complaint, but denied Nabisco's attempt to allege new facts to support its negligence claims.[1]

### 2. Central and AUL's claims.

In response to Nabisco's fourth amended complaint, Central filed suit against Krusinski, Brandonisio, Artlow, and Blocker for breach of warranty. Central maintains that Catellus assigned its rights to enforce any warranties arising out of the construction contracts to Central. AUL, Central's affiliate, also filed a third-party complaint against Catellus. Relying on prior negotiations and the tenant lease between Central and Catellus, AUL alleged that it was a direct third-party beneficiary of the tenant lease and had the same rights as Central under the lease. Additionally, AUL brought claims against Krusinski, Brandonisio, Artlow, and Blocker, asserting that it had a right to recover damages as Nabisco's bailee. The defendants sued by AUL and Central moved to dismiss those claims, asserting various defenses, including lack of standing. Judge Bucklo granted the defendants' motions to dismiss the complaints of AUL and Central and denied AUL leave to amend.

AUL and Central jointly filed a motion seeking clarification of the judgment. In response to this motion for clarification, the district court reinstated Central's claim against Blocker, the excavation contractor, and issued its

---

[1] Nabisco's other claims remain before the district court. Seeking resolution of the same matters as AUL and Central, Nabisco sought and received a Rule 54(b) judgment on its dismissed claims shortly after AUL's and Central's claims were dismissed.

final judgment against AUL and Central with respect to all claims except Blocker's. Nabisco, AUL, and Central timely appealed.

## II.  ANALYSIS

When reviewing claims dismissed pursuant to Rule 12(b)(6), we ask whether the plaintiffs can prove any set of facts supporting their claims that would entitle them to relief. We accept all the well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving parties. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). Our review of the district court's decision to grant a motion to dismiss under Rule 12(b)(6) is de novo. *Id.* We review the court's denial of leave to amend complaints for an abuse of discretion. *See J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 819 (7th Cir. 1991).

### A.  Nabisco's Tort Claims[2]

#### 1.  Negligence and the economic loss doctrine.

The economic loss doctrine denies a tort remedy for product defects when the loss "is rooted in disappointed contractual or commercial expectations." *See Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001) (quoting *Collins v. Reynard*, 607 N.E.2d 1185, 1188 (Ill. 1992) (Miller, C.J., concurring)). Contract law provides the proper remedy for disappointed commercial expectations, such as when a product is unfit for its intended use. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435

---

[2] The parties agree that Illinois law applies to their diversity claims.

N.E.2d 443, 450 (Ill. 1982). Recovery in tort for disappointed commercial expectations due to breach of implied duties and warranties between non-contracting parties is also barred by the economic loss doctrine. *See Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 327 (Ill. 1982); *Moorman*, 435 N.E.2d at 450. To recover in tort under the economic loss doctrine, a party must show harm above and beyond a party's contractual or commercial expectations. *In re Chicago Flood Litigation*, 680 N.E.2d 265, 276 (Ill. 1997).

In *Chicago Flood*, a broken water main in Chicago flooded many downtown businesses. *Id.* at 268. The Illinois Supreme Court held that only plaintiffs who lost perishable inventory as a result of interrupted electrical service could recover in tort. *Id.* at 276. The court reasoned that these plaintiffs were not "seek[ing] damages for the loss of continuous electrical service, which is a disappointed commercial expectation." *Id.* Instead, the plaintiffs sought damages for perished goods, which were recoverable because "[s]uch damages are above and beyond class plaintiffs' disappointed commercial expectation" and thus, "fall outside the definition of economic loss and are recoverable in tort." *Id.*

In this case, Nabisco asserts that it lost $30 million in part due to AUL's alleged negligence which made the warehouse and its products unfit for use. However, in contrast to the plaintiffs' claims in *Chicago Flood*, Nabisco's claims of recovery for contamination were not above and beyond their commercial expectations. In fact, Nabisco bargained for and received a contractual protection against contamination in the form of AUL's promise to keep harmful chemicals in a separate part of the warehouse. This expectation was not met, and as a result Nabisco suffered a loss. Although Nabisco spent more to address the contamination than it was entitled to recover from AUL, Nabisco accepted this risk when it contracted to hold AUL responsible for a maximum of $1 million for

breaching this term. Nabisco cannot circumvent this bargained-for limitation by suing in tort for those disappointed commercial expectations addressed in the contract. *See Moorman*, 435 N.E.2d at 450. Its negligence claim against AUL is therefore barred by the economic loss doctrine.

Nabisco's negligence claims against Central, Catellus, Krusinski, and the subcontractors are also barred by the economic loss doctrine. Nabisco alleges that Central, Catellus, Krusinski, and the subcontractors breached their warranties against latent defects. *See Redarowicz*, 441 N.E.2d at 327. However, the damages that Nabisco seeks are economic losses, which are addressed by contract law, not tort law.[3] In *Redarowicz*, the second purchaser of a house discovered that there were latent defects that caused the chimney and adjoining brick wall to separate from the house. *Id.* at 326. The purchaser's claims were for deterioration and loss of bargain resulting from inferior workmanship. *Id.* at 327. The court found that the losses from the latent defects were disappointed commercial expectations because the only losses the purchaser incurred were "additional expenses for living conditions that were less than what was bargained for." *Id.* Like Redarowicz's claims, Nabisco's negligence claims against Central, Catellus, Krusinski, and the subcontractors are for the recovery of losses due to a construction defect. Nabisco claims that as a result of the defendants' breach its products were contaminated, making them unfit to sell and causing Nabisco to lose the bargained-for use of the warehouse. These losses are for disappointed commercial expectations, which were contemplated by the

---

[3] Although the law of torts developed out of the law of warranties, the law of warranties and contract law remain the appropriate manner in which to redress a purchaser's disappointed commercial expectations. *Moorman*, 435 N.E.2d at 450.

contract. Therefore, unless Nabisco qualifies for an exception, its negligence claims against AUL, Central, Catellus, Krusinski, and the subcontractors are barred by the economic loss doctrine.

2.  Exceptions to the economic loss doctrine.

There are three exceptions to the *Moorman* economic loss rule,[4] though the parties agree that only one exception is at issue—whether Nabisco's property damage was caused by a sudden, calamitous, or dangerous occurrence. *See Chicago Flood*, 680 N.E.2d at 275; *Moorman*, 435 N.E.2d at 449-50. In deciding whether the occurrence was sudden, dangerous, or calamitous, the court must determine the nature of the defect and the manner of occurrence. *See Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 49 (Ill. 1997); *Moorman*, 435 N.E.2d at 449. Even when the evidence is viewed in the light most favorable to Nabisco, we conclude that the nature and manner of the contamination of Nabisco's bakery products does not fall under this exception.

In contamination cases, Illinois courts have generally rejected the application of the sudden or calamitous occurrence exception, unless the defect makes the product hazardous or unreasonably dangerous. *See Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*, 613 F. Supp. 985, 989 (N.D. Ill. 1985) (contamination of flour by sand did not fall under exception); *NBD Bank v. Krueger Ringier*,

---

[4] The other two exceptions to the economic loss doctrine are: 1) "the plaintiff's damages are proximately caused by a defendant's intentional, false representation," or 2) "the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *See Chicago Flood*, 680 N.E.2d at 275.

*Inc.*, 686 N.E.2d 704, 708 (Ill. App. Ct. 1997) (contamination of land by petroleum did not fall under exception); *Cloverhill Pastry-Vend Corp. v. Cont'l Carbonics Products, Inc.*, 574 N.E.2d 80, 82-83 (Ill. App. Ct. 1991) (contamination of bakery products by metal chips did not fall under exception); *cf. Electronics Group, Inc. v. Central Roofing Co.*, 518 N.E.2d 369, 371 (Ill. App. Ct. 1987) (flooding due to faulty roof fell within exception); *United Air Lines, Inc. v. CEI Indus. of Ill., Inc.*, 499 N.E.2d 558, 563 (Ill. App. Ct. 1986) (flooding and roof collapse due to faulty roof fell within exception).

Loss from contamination is recoverable notwithstanding the economic loss rule if the product becomes inherently and unreasonably dangerous. In *Board of Education v. A, C & S, Inc.*, 546 N.E.2d 580 (Ill. 1989)*,* the court acknowledged that it was "artificial" to call asbestos contamination "sudden," so the court held that recovery for contamination was not barred by the economic loss doctrine if the contamination was hazardous or unreasonably dangerous. *Id.* at 588-90; *see also Blommer Chocolate Co. v. Bongards Creameries, Inc.*, 635 F. Supp. 911, 916-17 (N.D. Ill. 1985) (loss from contamination of chocolate by salmonella-infected whey is recoverable because it poses a health risk to consumers).

Here, however, Nabisco alleges in its third amended complaint that the contamination *did not* pose a health risk. Given this allegation, Nabisco could not plead any facts that would support a finding that the contamination of its products meets the requirements for the application of this exception to *Moorman. See Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994) ("[I]f a plaintiff . . . plead[s] particulars, and they show that he has no claim, then he is out of luck—he has pleaded himself out of court."); *R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 280 (7th Cir. 1988) (stating that a court is "not obliged to ignore any facts set forth in the

complaint that undermine the plaintiff's claim"). Therefore, we agree with the district court that Nabisco's negligence claims are barred by the economic loss doctrine and were properly dismissed.

Nabisco sought leave to amend its complaint to add additional facts showing that its products were contaminated as soon as they entered the warehouse, but did not seek to withdraw its allegation that the contamination posed no health risk. Therefore, the proposed amendment would have been futile and the district court did not abuse its discretion in denying it.

### 3. Failure to warn.

Nabisco's claims against Specco and Hydrite for breach of their duties to warn are based on the same negligence claims discussed above. Specco and Hydrite's alleged breach was a direct and proximate cause of Nabisco's commercial loss. Nabisco is seeking recovery for its lost commercial expectations of storing its products in an uncontaminated warehouse and selling its products to consumers. Those who suffer loss of commercial expectations such as reduced value, repair and replacement, or lost profits are barred from tort recovery and are relegated to seeking recovery under contract law. *Moorman,* 435 N.E.2d at 450 (quoting *Pa. Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1174-75 (3d Cir. 1981)). Nabisco does not meet any of the exceptions to the economic loss doctrine. Hence, the district court's dismissal of Nabisco's duty to warn claims was proper.

### B.  Mandatory Arbitration of Central's Breach of Warranty Claims

The district court ruled that the mandatory arbitration provision in the tenant lease between Catellus and

Central applies to all of Central's claims, including those against Krusinski and the subcontractors, and that each of the parties Central brought a claim against must submit to arbitration.[5] The court left open the question of whether there was a valid assignment to Central of Catellus's rights.

Although the Federal Arbitration Act favors resolution of disputes through arbitration, its provisions are not to be construed so broadly as to include claims that were never intended for arbitration. *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000). To decide whether parties agreed to arbitrate their claims, this court must look at the intent of the parties at the time the contract was executed. *Id.* at 593-94. We review the district court's ruling to compel arbitration de novo. *Harter v. Iowa Grain Co.*, 220 F.3d 544, 549-50 (7th Cir. 2000).

In this case, the intent of the parties is clear. The arbitration provision in the tenant lease between Central and Catellus applies only to the tenant lease. In the multitude of contracts in this action, there are no other contractual arbitration provisions. If Catellus had intended to require the contractor or the subcontractors to arbitrate their claims, then an arbitration provision would have been added to these contracts.[6] Therefore, the contractor

---

[5] We note on appeal that the subcontractors agree that the district court's determination of their intent to arbitrate was in error, and therefore no parties here dispute that the subcontractors did not agree to arbitrate issues pertaining to the warehouse construction. Nevertheless, the issue of whether the contractor and the subcontractors are required to submit to arbitration is still before this court.

[6] Furthermore, we note that Catellus entered into these construction contracts eight months before it executed the tenant lease. We find it difficult to imagine that at the time of these

(continued...)

and the subcontractors cannot be required to arbitrate this dispute.

The court further ruled that the arbitrator must decide whether there was a valid assignment of Catellus's rights to Central. However, in the very next paragraph the court held that there was no evidence that Central was assigned the right to sue. It is unclear whether the issue of assignment was decided and, based on the limited record before the court, we cannot decide the matter. This is because the issue of assignment of warranty rights depends on unresolved questions of fact based on the parties' intentions. *See Bd. of Managers of Medinah on Lake Homeowners Ass'n v. Bank of Ravenswood*, 692 N.E.2d 402, 405 (Ill. App. Ct. 1998) ( the parties' intentions to create an assignment is a question of fact and "must be determined based upon the instruments executed as well as the surrounding circumstances"); *Rivan Die Mold Corp. v. Stewart-Warner Corp.*, 325 N.E.2d 357, 361 (Ill. App. Ct. 1975). We cannot say as a matter of law that there was no assignment, so we remand the issue to the district court. If the court determines that there was an assignment, then the breach of warranty claims should not have been dismissed.

The district court dismissed Central's breach of warranty claim, concluding that Central could not enforce the warranties issued by the contractor and subcontractors. The parties agree that the subcontractors all issued warranties relating to the proper design and construction of the warehouse, though they disagree as to the intended recipients of these provisions. Central asserts that as a result of Catellus's assignment of rights to Central under

---

[6] (...continued)

construction contracts, the parties intended to incorporate the arbitration provision of the later tenant lease.

the tenant lease, it can sue the subcontractors for breach of warranty. In response, the subcontractors argue that the warranties in their contract extend only to Krusinski, not Catellus, and Central does not have standing to sue them for breach of warranty claims.

Contrary to the subcontractors' argument, their warranties do extend to Catellus. In Section 9.8 of the subcontractors' agreement, the subcontractors warrant their work against defects and agree to satisfy the warranty obligations without cost to the "Owner or Contractor." The first page of the subcontractors' agreement lists Catellus as the "Owner." Therefore, the plain language of the subcontractors' agreement reflects that Catellus has the right to enforce the subcontractors' warranties. So, if the district court determines that there was a valid assignment of Catellus's rights under the subcontractors' agreement to Central, Central has a right to maintain breach of warranty claims against all of the subcontractors. Thus, the district court's ruling requiring mandatory arbitration for Catellus's breach of warranty claims is reversed and the issue of whether there was a valid assignment of Central's rights to Catellus is remanded for further proceedings.

## C.  AUL's Third-Party Beneficiary Claims

A direct third-party beneficiary is a person who, although not a party to the contract, the contracting parties *intended* to benefit from the contract. *See A.E.I. Music Network, Inc. v. Bus. Computers, Inc.*, 290 F.3d 952, 955 (7th Cir. 2002); *XL Disposal Corp. v. John Sexton Contractors Co.*, 659 N.E.2d 1312, 1316 (Ill. 1995). By contrast, an incidental third-party beneficiary is a person who, not a party to the contract, receives a benefit from the contract *unintended* by the contracting parties. *See, e.g.*, *A.E.I. Music Network*, 290 F.3d at 955; *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187-88 (Ill. 1981). Only a direct

third-party beneficiary may enforce the contract because the contracting parties intended for the beneficiary to receive the benefits of the contract. *See A.E.I. Music Network*, 290 F.3d at 955; *Altevogt*, 421 N.E.2d at 187. To decide whether a party is a direct or an incidental third-party beneficiary, we must determine the intent of the parties based on the contract as a whole as well as the understandings between the parties at the time of the contract's execution. *See A.J. Maggio Co. v. Willis*, 738 N.E.2d 592, 599 (Ill. App. Ct. 2000); *Ball Corp. v. Bohlin Bldg. Corp.*, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989).[7]

AUL argues that it was a direct third-party beneficiary of the tenant lease between Central and Catellus because Catellus acknowledged that Central would operate the warehouse using AUL's name. Specifically, the tenant lease states in Paragraph 15 that Central will conduct its operations under its name and under the name of its affiliate AUL, and these operations will not constitute subletting. In addition, AUL argues that Catellus knew all along that Central and AUL were virtually identical corporations under the common control and ownership of Concepcion because initially Concepcion approached Catellus about the warehouse space on AUL's behalf.[8]

In response, Catellus argues, and the district court ruled, that Section 17.1.8 of the tenant lease defeats AUL's

---

[7] Catellus argues that under Illinois law it is presumed that the parties to a contract intend that the contract's provisions apply only to them—not to third parties. *See Ball Corp.*, 543 N.E.2d at 107. However, this is not a full reading of *Ball Corp.*, which also states that the intent to create a direct third-party beneficiary is determined by the contract's language and the surrounding circumstances at the time of the contract's execution. *Id.*

[8] These negotiations were managed by Frolian Concepcion, who wholly owns AUL and Central.

claim that it was a direct third-party beneficiary since it clearly states that "nothing herein is intended to create any third party benefit." However, Paragraph 15 makes Section 17.1.8 ambiguous because Paragraph 15 clearly confers an intended benefit on AUL: the authority to operate the warehouse. Catellus also asserts that no direct third-party beneficiary was created by the contract because Central's name, not AUL, is on the contract. Nevertheless, AUL's name remained in the contract as the operator of the warehouse space, an intended benefit. The acknowledgment of AUL in the contract and the alleged discussions during contract negotiations are enough to show that Central and Catellus intended AUL to receive a benefit from the contract. Therefore, AUL has stated a valid third-party beneficiary claim under Illinois law.[9]

### III.  CONCLUSION

For the reasons discussed, as to No. 01-2310, we AFFIRM the judgment of the district court against Nabisco. As to Central's claims under No. 01-1711, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion. Furthermore, under No. 01-1711, we AFFIRM the court's denial of AUL's motion for leave to amend its complaint, but REVERSE the judgment of the court regarding AUL's third-party beneficiary claims and REMAND for further proceedings consistent with this opinion.

---

[9]  AUL tried to add a bailment claim on Nabisco's behalf to pursue negligence claims against Catellus and the construction subcontractors. However, if Nabisco does not have a valid negligence claim against these parties, then neither does AUL. Thus, AUL's bailment claims are also barred by the economic loss doctrine. The district court denied AUL's motion to amend and we affirm.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—2-12-03